**SIGNED THIS: July 10, 2006**

_____
**MARY P. GORMAN**
**UNITED STATES BANKRUPTCY JUDGE**
_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

```
In Re                          )
                               )    In Bankruptcy
WILLIAM L. SIELSCHOTT and      )
GINA D. SIELSCHOTT,            )    Case No. 04-75038
                               )
        Debtors.               )
_____)
                               )
SHELBY SHORE DRUGS, INC.,      )
                               )
        Plaintiff,             )
                               )
    v.                         )    Adversary No. 05-7046
                               )
WILLIAM L. SIELSCHOTT,         )
                               )
        Defendant.             )
```

## O P I N I O N

The issue before the Court is whether nondischargeable punitive damages should be assessed against an employee who stole

money from his employer.

The Defendant, William Sielschott, is in his early forties. He graduated from high school in 1982 and he received his degree in pharmaceutical sciences from the St. Louis University College of Pharmacy in 1987. He makes his living as a licensed pharmacist.

From June, 1996, to October, 2000, Mr. Sielschott worked as a pharmacist for Excel Corp. in Decatur, Illinois. He was the pharmacist-in-charge in one store and the pharmacy director for Excel's four stores in Decatur. A pharmacist-in-charge is responsible for a store's drug inventory and compliance with state regulations concerning the sale of drugs. A pharmacy director is responsible for the day-to-day operations of the pharmacy, including making sure that the pharmacy is properly staffed.

In the summer of 1998, Mr. Sielschott stole two postal money orders totaling about $600 from an Excel store where he was working. He deposited the money orders in his bank account. His bank became suspicious and alerted postal inspectors. Mr. Sielschott was charged with theft, pled guilty, and was placed on court supervision with a sentence of community service. He successfully completed his court supervision and, therefore, does not have a criminal record regarding the incident. He told Excel about the theft after he was caught. He apologized, offered to resign, and promised that it would never happen again. Excel accepted the apology, talked to Mr. Sielschott about trust issues,

and declined his offer of resignation.

In October, 2000, Excel, through its subsidiary, Shelby Shore Drugs, Inc., opened a new drug store in Shelbyville, Illinois. Mr. Sielschott was selected to manage the new store, which was called Family Drug. He was both the store manager and the pharmacist-in-charge. As the store manager, he was responsible for hiring the staff, scheduling, and the day-to-day operations of the store.

Mr. Sielschott's annual salary in 2000 was $88,000. His salary increased to $89,000 in 2001 and to $92,000 in 2002. In addition, he received health insurance and access to an employer matched 401(k) program.

According to his own testimony, beginning in late 2001, Mr. Sielschott began stealing from Family Drug. He opened a bank account at Shelby County Bank on December 23, 2001, and he deposited the pilfered funds into this account. His thefts increased as time went on. By April of 2003, he was stealing more than half the time that he was at work. By his own calculations, he stole about $90,000 from the store.

Mr. Sielschott used the money on what he described as frivolous spending. He bought new cars frequently and took family vacations he could not afford. He stated that he could not say "no" to his children. He also bought a single-engine propeller-driven airplane in late 2002 for over $60,000. The airplane was not in good condition and needed extensive repairs.

In 2003, Shelby Shore became concerned about the lack of cash flow at Family Drug. A review of the journal register tapes indicated that suspicious transactions were occurring late in the day or after hours and usually while Mr. Sielschott was working. Shelby Shore installed surveillance video cameras in the store for a month. The tapes showed Mr. Sielschott stealing every day.

On May 9, 2003, Mr. Sielschott was called to the home office of Excel in Decatur. Mr. Sielschott was confronted with the evidence against him and he admitted taking money from the store. He immediately retrieved several checks from his briefcase which he had not yet converted to cash and gave them to the company. He then talked to the Illinois State Police. Following his meeting with the police, he went to the Shelby County Bank and withdrew $14,000 from his account. This money was turned over to the police, and the police, in turn, handed it over to Family Drug.

Mr. Sielschott was charged with felony theft of an amount in excess of $10,000 but less than $100,000 in violation of 720 ILCS 5/16-1(a)(1)(A). He entered an open plea of guilty and received a three-year sentence. He served two months in the Graham Correctional Center and seven months in the Taylorville Correctional Center. He was then on parole for two years.

Mr. Sielschott was also ordered to pay $179,549.91 in restitution to Family Drug. He has paid this amount in full. To make the payment, he and his wife sold their home, his interest in

a 58-acre farm, their vehicles, and substantial amounts of personal property including a Rolex watch.  He also borrowed $92,000 from a bank in order to complete the restitution.  Mr. Sielschott was able to borrow the money only because his parents co-signed the loan.  The loan requires payments of $500 every two weeks.  His parents made the payment while he was incarcerated.  He still owes the bank $72,000.

After he lost his job with Family Drug, Mr. Sielschott was employed as a pharmacist on a part-time basis by St. Joseph's Hospital in Bloomington, Illinois from August to December, 2003.  Mr. Sielschott was unemployed from December 2003 to November 2005.  He was in prison for nine of those months.  When he got out of prison, his pharmacist's license was suspended.  His license was reinstated in July, 2005.  The reinstatement provided for two years of probation.  One of the conditions of probation is that Mr. Sielschott inform his employer about his felony conviction and the probationary status of his pharmacist's license.

Mr. Sielschott is married and the father of three teenage children.  Because he had to sell the family home in Shelbyville to pay restitution, his family now lives in a 125 year-old farm house near Litchfield owned by Mr. Sielschott's father.  They pay rent of $500 per month, but were two months behind on the rent at the time of trial.  Mr. Sielschott now drives a 2004 Oldsmobile Alero and his wife drives a 2003 Chevrolet Venture.  Both vehicles are worth

-5-

only about what is owed on them.

Mr. Sielschott has had serious medical problems. In the early nineties, he became addicted to painkillers after a drunk driver hit him head-on. He voluntarily entered the Illinois Addicted Pharmacist Program and successfully completed the program. In 1997, he was diagnosed with Hodgkin's lymphoma. His medical insurance covered most of the bills, but he still had $20,000 in uncovered out-of-pocket expenses. He continues to see oncologists. He will be considered cured in October. Mr. Sielschott was also diagnosed with a bipolar disorder in June, 2003. He takes Depakote for his depression.

Mr. Sielschott has been working as a third-shift pharmacist at St. Joseph's Hospital since the end of November, 2005. He works from 10:00 p.m. to 7:00 a.m. He earns $43 per hour and works 68 to 70 hours every two weeks. He commutes 120 miles each way to the hospital in Bloomington from his home in Litchfield. He cannot afford to move his family to Bloomington.

Mr. Sielschott does not own any real estate. He has about $60,000 in a 401(k) account. He has less than $200 in his bank account. He owes the bank $26,000 on two vehicles and another $72,000 on the loan he took to pay his restitution. He also owes his parents for supporting his family while he was incarcerated and unemployed. His wife earns $8 per hour as a receptionist. Neither he nor his wife has income from any other source.

Shelby Shore admits that it has been repaid the $179,549.91 which it calculated was stolen by Mr. Sielschott.[1] Shelby Shore filed a civil action in Shelby County Circuit Court seeking $500,000 in punitive damages and another $313,283.54 in compensatory damages for the value of wages, health insurance, bonuses, and deferred benefits paid to Mr. Sielschott by Shelby Shore while Mr. Sielschott was stealing from the store. The state court litigation was stayed when Mr. Sielschott filed a petition pursuant to Chapter 7 of the Bankruptcy Code. Shelby Shore then filed a Complaint to Determine Dischargeability of Debt pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(4). Shelby Shore sought a determination of the nondischargeability of three components of damages: (1) what he stole; (2) compensation paid to him while he was stealing, and (3) punitive damages. As previously noted, Mr. Sielschott has paid restitution to Shelby Shore for what he stole. This Court's predecessor previously granted partial summary

---

[1] At trial, Mr. Sielschott testified that the amount he had paid in restitution substantially exceeded the amount he stole. He claimed that all money taken from Family Drug had been deposited in his Shelby County Bank account and the bank statements showed deposits of only about $90,000. Shelby Shore countered that it believed its losses exceeded the amounts paid in restitution. The amount paid came from an audit of register tapes but Shelby Shore's president suggested that cash thefts could have occurred which would not have been reflected on those tapes. The parties reached agreement on an amount of compensatory damages during the state court criminal proceedings. The accuracy of the agreed figure is not before this Court and is not relevant to the issue of whether punitive damages should be awarded here.

judgment on the issue of compensation, finding it dischargeable as a breach of contract. *See* In re Sielschott, 332 B.R. 570 (Bankr. C.D. Ill. 2005). The only remaining issue is Shelby Shore's claim for punitive damages. Both parties agree that the Court has the authority to assess punitive damages. If punitive damages are awarded, they are nondischargeable. Cohen v. de la Cruz, 523 U.S. 213, 218, 118 S.Ct. 1212, 1216 (1998). The question is whether this is an appropriate case for punitive damages. At trial, Shelby Shore reduced its claim for punitive damages to $50,000.

Punitive damages are not favored under Illinois law. Zelinski v. Columbia 300, Inc., 335 F.3d 633, 641 (7th Cir. 2003). Punitive damages may only be awarded when a tort is committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully or with such gross negligence as to indicate a wanton disregard of the rights of others. Kempner Mobile Electronics, Inc. v. Southwestern Bell Mobile Systems, 428 F.3d 706, 714 (7th Cir. 2005). The purpose of awarding punitive damages is to punish the wrongdoer, to deter the wrongdoer from repeating the conduct and to also deter others from similar conduct. Page v. City of Chicago, 299 Ill.App.3d 450, 463, 701 N.E.2d 218, 227 (Ill.App.Ct. 1998), *appeal denied* 182 Ill.2d 552, 707 N.E.2d 1240 (1999). Three factors are particularly relevant in determining the amount of a punitive damages award: (1) the nature and enormity of the wrong; (2) the financial status of the

-8-

defendant, and (3) the potential liability of the defendant resulting from multiple claims. Republic Tobacco Co. v. North Atlantic Trading Co., Inc., 381 F.3d 717, 735 (7th Cir. 2004). These factors are not exclusive; each case should be judged on its own unique set of facts. Black v. Iovino, 219 Ill.App.3d 378, 393, 580 N.E.2d 139, 162 Ill.Dec. 513 (1991).

Mr. Sielschott's conduct in stealing from his employer was reprehensible. His acts were repeated over a long period of time and were done in a planned, calculated way to avoid detection. The amounts he took were substantial. Clearly, punitive damages could be awarded based on such conduct.

Nonetheless, Mr. Sielschott's actions were criminal and he has been punished by the criminal justice system. He served time in prison and has paid a substantial amount of restitution. He lost not only the proceeds of his theft but also the other assets he and his wife had worked to acquire over the years. His professional license was suspended and, even if he successfully completes his probation, it is doubtful that he will ever be able to obtain employment without disclosure of his past to the employer. His ability to earn income will forever be negatively impacted. He owes large amounts to a bank and to his parents and will be paying both for many years. He must certainly have lost the respect of family and friends. Accordingly, the purposes of awarding punitive damages would not be served by awarding such damages in this case.

Mr. Sielschott must have the message by now that this type of conduct will not be tolerated. Anyone else looking at Mr. Sielschott's current situation would certainly get the same message.

There is no room in Mr. Sielschott's budget for the payment of punitive damages. He is working hard to keep a roof over his head and to provide for his family. He is behind on his rent and his parents continue to help the family make ends meet. Any award of punitive damages made in this case would only serve to further punish Mr. Sielschott's family members who are not responsible for his conduct. If his wages are garnished to pay a punitive damage award, he may be unable to make his bank payments or pay his rent and one or both of those obligations would fall back to his parents. Under Illinois law, a punitive damages "award which bankrupts the defendant is excessive." Southwest Whey, Inc. v. Nutrition 101, Inc., 188 F.Supp.2d 986, 989-90 (C.D. Ill. 2002), *quoting* Hazelwood v. Illinois Central Gulf R.R., 114 Ill.App.3d 703, 713, 450 N.E.2d 1199, 1207, 71 Ill. Dec. 320, 328 (Ill.App.Ct. 1983). Mr. Sielschott is already in bankruptcy and, despite discharging $153,000 in unsecured debt with his bankruptcy, his financial condition remains precarious.

Due to his felony conviction, Mr. Sielschott's prospects for a better job are not good. He continues to make the 240-mile round trip commute to Bloomington for work because St. Joseph's is the

only place that will hire him.  Shelby Shore admitted that it had never knowingly hired a felon and would never hire someone like Mr. Sielschott who had stolen from a previous employer.

After carefully considering all of the relevant factors, the Court concludes that this is not an appropriate case for punitive damages.  The punitive damages goals of punishment and deterrence have been accomplished.  Mr. Sielschott committed a crime and he has been punished by the criminal justice system.  He served time in prison and on parole, paid restitution, and carries a felony conviction on his record.  His professional license was suspended and he is now on probation.  Although this Court does not condone Mr. Sielschott's conduct in any way, the Court must nevertheless conclude that an award of punitive damages would not serve a purpose in this case.

For the foregoing reasons, Shelby Shore's request for punitive damages is denied.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###